IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 7 |
| KENT LINDUFF | § | |
| | § | CASE NO. 19-20025 |
| | § | |
| *Debtor* | § | |
| | § | |

| | | |
|---|---|---|
| LISA ROBERTS | § | |
| | § | Adversary Proceeding No. 19-_____ |
| v. | § | |
| | § | |
| KENT LINDUFF, INDIVIDUALLY, | § | |
| AND KENT D. LINDUFF, AS TRUSTEE | § | |
| OF THE KENT D. LINDUFF & LINDA | § | |
| P. LINDUFF FAMILY TRUST | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT AGAINST DEFENDANT DEBTOR OBJECTING TO DEBTOR'S DISCHARGE OF (1) THE DEBTOR'S DEBT TO PLAINTIFF OR (2) ALTERNATIVELY TO ANY DEBTS

TO THE HONORABLE DAVID JONES, UNITED STATES BANKRUPTCY COURT JUDGE:

Plaintiff Lisa Roberts ("Ms. Roberts" or "Plaintiff") hereby files this Complaint against Defendant Debtor Kent Linduff, Individually, and Kent D. Linduff, as Trustee of the Kent D. Linduff & Linda P. Linduff Family Trust (collectively "Defendant"), and would show the Court the matters set forth below.

### I.      Bankruptcy procedural allegations

1.      Plaintiff Lisa Roberts is a natural person who resides in Houston, Texas.

2.      Defendant is a natural person who may be served with process at his address at 155 Mustang Royale Boulevard, Port Aransas, Texas 78373.

1

3.     On January 28, 2019 Defendant filed his Chapter 7 bankruptcy case under Case No. 19-20025.

4.     This Court has personal jurisdiction over Defendant.  Venue of this suit before this Court is proper in light of Defendant's Chapter 7 bankruptcy case pending in this Court.

5.     This is an adversary proceeding that challenges the discharge of the debts Defendant owes Plaintiff based on §523 of the Bankruptcy Code, or alternatively, Defendant receiving a discharge of any debts based on §727 of the Bankruptcy Code. This Court has subject matter jurisdiction over this suit pursuant to at least 28 U.S.C. 157 and 11 U.S.C. 523 and 727.  This adversary proceeding is a "core" matter within the meaning of 28 U.S.C. 157, and this Court has the constitutional power and authority to enter a final judgment (not subject to de novo review by the District Court) regarding the issues in this adversary proceeding.  If the same is necessary, Plaintiff consents to this Court entering final orders in this adversary proceeding.

## II.  <u>Substantive allegations: state court</u>

6.     A lawsuit filed in Kendall County, Texas styled *Lisa Ann Roberts a/k/a Lisa Ann Bays vs. Employernow Development Company, LLC, Successor in Interest and f/k/a Employernow,* Cause Number 13-310 in the Judicial District Court of Kendall County, Texas (the "state court case"), arose out of Kent and Linda Linduffs' abuse of the relationship with their "dear friend" and "angel investor" — Lisa Roberts — through their manipulation of two companies, EmployerNow Development Company, LLC, successor in Interest and f/k/a EmployerNow Development Company, Inc. ("Endco") and EmployerNow Management Group, Inc., its predecessors and successors, if any ("Management") (collectively, the "Entities").  At the time of Ms. Robert's making of the four loans to the Entities, Kent Linduff controlled the Entities and, along with his wife, Defendant Linda Linduff, owned 100% of the stock of the Entities.

7.     In 2009, after years of friendship, endearing themselves to Ms. Roberts through family vacations shared with their children and "counseling" sessions offered out of purported love and

affection, the Linduffs lured Ms. Roberts into loaning $875,000 to Endco in an effort to help the Linduffs' "revolutionary" business get off the ground, while providing a wise and safe investment for Ms. Roberts' nest egg. The Linduffs pounced on Ms. Roberts, who was emerging from a brutal divorce, at a time when she was particularly vulnerable. Through cajoling, condescension disguised as concern, and promises of an imminent "deal" that would protect Ms. Roberts and her children's financial future, the Linduffs lured Ms. Roberts into loaning them $875,000.

8.      Shortly after the four loans were made, the Linduffs, primarily Kent Linduff, began to make excuses for the failure to make payments. Repeated requests from Ms. Roberts were met with acknowledgment of the loans and endless promises to repay them. The Linduffs delayed Ms. Roberts' efforts to recover what she was owed for years by these repeated assurances. Meanwhile, they were—as planned—pilfering Ms. Roberts' money from the companies.

9.      Kent Linduff represented that the business needed short-term capital to fund the final stages of a project that would bring nearly overnight success. All the loans were intended to be repaid within a year. The first two loans were written and accrued interest at the rate of 10% per year. The second set were oral, with the parties intending that the initial, written terms would apply to the second set of loans.

10.     Loan One and Loan Two were executed by Kent Linduff on behalf of Endco. Those loans were deposited directly into Endco. Loan One, for $300,000, was transferred to Management. Loan One was not reported to the IRS in 2009. These entries first show up on Management's books as a loan from Ms. Roberts on December 31, 2012. After the lawsuit was filed and discovery was propounded—when Ms. Roberts asked for company financials—Linda Linduff altered the company books. She transferred $60,000 of the $300,000 loan as a payable to herself and the remaining $240,000 to an affiliate of the Entities, Enrollbest.

11.     Not only did the Linduffs take Ms. Roberts' money, but they did so, ultimately, through account revenue-neutral entries that enabled the Entities to look like they loaned $240,000 to an

3

affiliate and give the appearance that Ms. Linduff loaned the company $60,000. These changes to the company books enabled the Linduffs to avoid reflecting Loan One as income to the IRS or as debt owed to Ms. Roberts and, instead, funnel it to themselves.

12.     Loan Two, for $125,000, was accurately characterized as a loan on Endco's financial statements and IRS filings. Management made a partial payment of $10,000 in May 2012. The $115,000 balance was never paid. Endco refused to produce its QuickBooks records and bank statements for the years 2009-2012. But what is clear is the money was paid out to the Linduffs or at their behest. Loan Two does not show up at all in its 2013-2015 QuickBooks files.

13.     Loan Three, in the amount of $350,000, was deposited in Endco's account on July 13, 2009. It then transferred the money to Management. Endco never reported receiving the $350,000 to the IRS as either income or an account payable (loan). Instead, Loan Three first appears in Management's 2013 tax filing, which was filed in in the third quarter of 2014, well over a year after the lawsuit was filed and five years after the money was received. The Linduffs then used an after-the-fact accounting fabrication of the Linduff's CPA, Chuck Lowrey, to create a means of hiding the money by re-classifying it as a non-equity contribution. Mr. Lowrey admitted he had no idea what a "non-equity contribution" was and that it was just "the best [he] could come up with at the time." For its part, Management entered a receivable in the same amount. This series of ledger selections accomplished what the Linduffs intended. They created offsetting account entries between their companies that were designed to show a tax and income neutral result – despite the infusion of $350,000 in cash paid to the company at least four years beforehand. In short, the transaction was designed to hide the Loan Three proceeds from the IRS and other creditors, including Ms. Roberts.

14.     Loan Four was paid to Endco. That $100,000 was reported on its books as a loan until Kent Linduff ordered his accountant, Chuck Lowrey, to recharacterize it in 2014 to give the impression that Ms. Roberts gave the company gifts; instead of loans. The catalyst for Linduff's changes was Ms. Robert's demand that the Linduffs produce tax and financial records in this case.

4

15.     Loan One and Loan Three were largely funneled to the Linduffs in the form of "wages" washed through Endco and into Management.  Management's 2009 Balance Sheet and P&L reflect this plainly.  They show the company had no income for the period but used $690,000 of Ms. Roberts' money (loaned to the company) to pay wages of $187,847.59.  They followed the same course the following year, paying themselves $204,021.00, and $170,013.56 in 2011.

16.     In 2012, Ms. Roberts' funds were finally depleted. The company received no income for 2012, but Endco still paid Management its "management fee" of $337,500.00 in order to funnel another $250,455.00 in "wages" to the Linduffs.  Notably, once the loans Ms. Roberts made were gone, Management removed all references to the amounts owed to her from its books in 2012.

17.     The following year, the Linduffs went to the well again; securing investment funds from others and again funneling those amounts through the Endco/Management washing machine.  Endco was converted from a corporation to a limited liability company in March 2013; transferring management and ownership interest (in part) to third persons.

18.     The Linduffs' scheme took money invested by lenders like Ms. Roberts and split the accounting between the two companies so they could create offsetting book entries.  The money would come in and be treated as a loan, non-equity contribution or something else that could be offset against Management's accounts.  In return, Endco would take the funds to "run" the businesses, which largely consisted of paying themselves wages.  For writing those checks to the Linduffs, paying insurance premiums, and the like, Management was paid its management fee income from Endco.  By appearances Management was not intended to make money but be a pass-through entity.

19.     Defendants executed the plan by securing loans, investments and the like from Ms. Roberts and others; and then paying the Linduffs through wages or attributing the funds invested by others as loans made by one of the Linduffs.  Mr. and Mrs. Linduff received income totaling $1,381,750 (Mr. Linduff received payments of $966,000 and Mrs. Linduff received payments of $415,750) from these lenders and investors.  That amount included most, if not all, of Ms. Roberts $875,000 in loans.

20.     The Linduffs' scheme is replete with indicia of fraud.  They used the companies to wash investor funds and pay themselves, which are common red flags of fraud.  The Linduffs reclassification of Ms. Roberts' loans, particularly after the start of the litigation in the State Court Case, are also strong indications of fraud.  The ongoing lack of company income and use of loan proceeds to pay the owners' wages over the course of several years reflects self-dealing.  The deceit is particularly clear in light of the fact that Kent Linduff told Ms. Roberts that sales were increasing and repayment of the loans was forthcoming throughout the period; when neither assertion was true.  It was all simply a scam to bleed investors like Ms. Roberts and then fold up the companies when the money was gone.

21.     Ms. Roberts was hoodwinked.  Kent Linduff, owner and CEO of the Entities, knew and intended that Ms. Roberts rely on his promises while he was steadfastly using the companies to wash the money and transfer it to him and his wife in the form of wages and unfunded loans.

22.     On more than one occasion, he told Ms. Roberts, "I know you trust me and I don't take that trust lightly!!! I don't play loose with your or my money for sure."  He and his wife, Linda Linduff, repeatedly advised that repayment of the loans was his "top priority" and that they would get her paid.

23.     These statements were made while the company had little or no income and was being funded by Ms. Roberts' loans.  Comparison of Mr. Linduff's statements claiming business success and imminent repayment to Ms. Roberts show that he was misleading her.  For example, in one email Linduff swears repayment is imminent and offers that his $40,000 monthly payroll is proof that she will soon have her loans resolved.  Mr. Linduff's representation was false: the company was not generating the alleged income or making the payroll Kent Linduff claimed.

24.     Ms. Roberts was not the only one being duped.  As time progressed and Ms. Roberts' loan was depleted, there were other investors in Endco and other affiliated entities along the way.  Those others have been similarly defrauded and are in the process of being paid, have been stalled through ongoing litigation, or simply given up chasing the ever-elusive Linduffs.

25.    Most of the money, at least from Ms. Roberts, was kept "off the books" and never reported to the IRS. Mr. Linduff lied to Ms. Roberts, telling her "[y]es the Corporate books clearly reflect the loans to the company, from you." Documents circulated to members of the company (after it was converted to a limited liability company) were no doubt aware of both Loan Two and Loan Four. A portion of that money ($40,000) was funneled to the Linduffs in the form of payroll before yearend 2013.

26.    The Linduffs begin to make efforts to legitimize their "accounting" for the money loaned by Ms. Roberts only after the State Court Case was filed. *After Ms. Roberts filed her lawsuit,* the Linduffs recharacterized the only two notes that were originally booked as loans (Loan Two and Loan Four) as a nonequity contributions.

27.    The Linduffs orchestrated a significant sham—using the Entities that they owned and controlled as the vehicle for their fraud. They raked investor money into the entities and affiliates only to pay themselves substantial salaries and other amounts without ever really generating anything.

28.    The Linduffs' manipulation of the Entities was notorious. They lured investors with promises of technical sophistication and industry experience. In one such arrangement, market leader Mutual Med was induced to market product in a joint venture. According to that set of "investors" and business partners, the Linduffs accepted approximately $460,000 of Mutual Med's funding only to fold up the company (Benefit 1) and jeopardize Mutual Med's business relationship with a third party, Two Rivers Insurance Company; leaving it no alternative but to walk away from its investment to protect its business with legitimate companies like Two Rivers. The Linduffs fleeced Mutual Med and its leadership out of nearly half a million dollars in less than a year.

29.    During the same dispute, the Linduffs made it clear (through their then counsel Doug Burford) that they were the persons in control of the company and would be the only parties responsible for the company's actions. Regardless of the veracity of either party's position in that dispute, two things are clear: (i) the Linduffs remained the majority owners of the businesses and

exercised control over the Entities to the exclusion of everyone else, including their so-called partners, and (ii) they used multiple, similar entities to funnel themselves funds in the form of administration fees and wages.

30.     The Entities took the money from two written loans with Ms. Roberts, the first for $300,000 and the second for $125,000, but only booked one of those deposits (Loan Two for $125,000) as a loan.  They never reported Loan Three to the IRS as income or on its books as a loan: instead, it first appears as a fabricated form of owner's equity in Management after the lawsuit was filed and the Linduffs told their accountant to treat the $350,000 as a gift. Loan Four was originally booked as a note, but in March 2014 it suffered the same fate of reclassification (as a "non-equity contribution") when Linda Linduff doctored the company QuickBooks files.

31.     Despite all these behind-the-scenes shenanigans, the Linduffs (individually and in their personal capacities) repeatedly ratified the loans' existence and assured Ms. Roberts that the money would be repaid. Linda Linduff confirmed all four loans, their interest, and the amounts due in her handwritten letter and its attached spreadsheet in May 2010.

32.     The promises to repay continued through 2010.  In August, Kent Linduff advised that "we have our end in sight.  Your principal and interest is coming."  Three months later, the Linduffs continued to offer nothing but excuses.

33.     With the loan more than a year overdue, Ms. Roberts wrote the Linduffs offering to reduce the amount owed for payment by March 3, 2011.  Linda Linduff responded in a letter dated February 15, 2011 affirming the debt and confirming that they were "moving forward desperately trying to meet your timeline" and assuring Ms. Roberts that "you can be sure that you are and have been our top priority."

34.     The following year, in May 2012, the Linduffs again affirmed their obligation and intention to pay. On May 23, 2012, Kent Linduff wrote to advise Ms. Roberts that the long-awaited funds had arrived and he would be paying off the loans. Ms. Roberts responded the following day confirming Mr. Linduff's email and providing him with spreadsheets reflecting the amounts owed.  A little over a month later, Mr. Linduff, responding to Mr. Roberts' demand

for the more than $1.15 million then owed on the four notes, stated "Good Lord Lisa . . . . We agreed and you continue to confirm the company will pay you with interest . . . You are being repaid as the income grows." There is no evidence of any income and the books were not shared with Ms. Roberts, despite her requests.

35.     Ms. Roberts again pressed for payment of the four loans in March 2013. Mr. Linduff responded stating "[y]es we acknowledge three unsecured notes with a couple of the entities. Yes I acknowledge our agreement is a 10% accrued interest until these notes are paid." Kent Linduff responded; again confirmed the notes and that they "(as agreed) are earning 10% interest until the notes are paid" in his subsequent email. By this time, he had spent all of Ms. Roberts' money (largely on himself and his wife) and obtained additional funding from others to continue the scheme.

36.     Ms. Roberts has nothing to show for her years of believing the Linduffs' promises and intentional misrepresentations. In the ten years since lending them money, her close, personal friends, the Linduffs, only paid $10,000 of the more than $2 million they owe. It is irrefutable that the Linduffs disregarded the Entities' corporate fiction and used them as a sham for the purpose of perpetrating fraud.

37.     Roberts on May 11, 2018 obtained a judgment in the State Court Case on fraud and breach of contract claims against Defendants EmployerNow Development Company, LLC ("Endco") and EmployerNow Management Group, Inc. ("Management"), entities controlled by the Debtor and his wife (now apparently deceased) Linda Linduff (the "Company Judgment;" see Exhibit A attached hereto). Roberts's claims in this lawsuit arose from loans she had been fraudulently induced by the Debtor Kent Linduff and his wife Linda Linduff to make to Endco and Management in 2009. Despite repeated promises from 2010 (the maturity of the loans) until 2013 (when the State Court Case was filed) by Kent and Linda Linduff to repay the loans, they were never repaid.

38. On December 14, 2018, a $2,109,491.10 judgment on breach of contract claims against the Debtor and his wife Linda Linduff was signed (the "Individual Judgment;" see Exhibit B attached hereto). Interest on the Individual Judgment accrues at the rate of $539.79 per day. The Fourth Court of Appeals has dismissed Defendant's appeal of the Judgment. See Exhibit C attached hereto.

39. The Individual Judgment was intended to only be entered against Defendant and his wife Linda Linduff, as the related motion for summary judgment on causes of action for breach of contract and fraud had been filed only against Defendant and his wife Linda Linduff. There was a clerical error in the third paragraph of the Individual Judgment where judgment on the fraud claims was to be entered against the Debtor and his wife Linda Linduff, but the Individual Judgment erred in entering judgment on these fraud claims against Endco and Management. As shown above in paragraph 37, a judgment for fraud had already been entered against Endco and Management. Roberts in the State Court Case filed a motion seeking nunc pro tunc relief to correct the clerical error in the Individual Judgment so that a judgment is entered against the Defendant and his wife not only on contract claims but also on fraud claims. This Court signed on April 11, 2019 an agreed order (Docket No. 28; the "Agreed Order") lifting the bankruptcy stay to permit Roberts to seek nunc pro tunc relief regarding these matters in the State Court Case.

40. Defendant and the other defendants in the State Court Case defrauded Roberts. Roberts believes that these parties fraudulently used loan proceeds they received from her in 2009 to acquire valuable real estate located at 118 Park Ridge, Boerne, Texas (the "Boerne Property"), and 155 Mustang Royale Boulevard, Port Aransas, Texas (the "Port Aransas Property"; its tax

value is $406,336.00; see <u>Exhibit D</u>). The Boerne Property is a house that was sold <u>post-petition</u> without notifying the Chapter 7 trustee of the same.

### III. <u>Substantive allegations: The Linduff Family Trust and post-petition conduct</u>

41.     Defendant and his wife Linda Linduff in 2012 created a self-settled trust called the  Kent D. Linduff and Linda P. Linduff Family Trust (the "Trust") at a time when Plaintiff was owed many hundreds of thousands of dollars, and Plaintiff was demanding payment of the same. The Port Aransas Property and the Boerne Property, along with other property, were promptly transferred by Defendant and his wife to the Trust.

42.     In Defendant's Statement of Financial Affairs in this bankruptcy case, Defendant has admitted that the Trust is a self-settled trust. The property the Trust claims is in fact owned by the bankruptcy estate, since the Trust without question was a self-settled trust, which under applicable Texas law means that the property purportedly owned by the Trust in fact remains property of the Debtor, and therefore property of the bankruptcy estate. *See In re Shurley*, 115 F.3d 333, 337-38 (5th Cir. 1997). Texas law is entirely and succinctly clear on this point. Section 112.035(d) of the Texas Property Code provides: "If the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of the settlor's beneficial interest does not prevent the settlor's creditors from satisfying claims from the settlor's interest in the trust estate." That is what is present here, and without question all of the purported assets of the Trust are in fact assets of the Debtor's bankruptcy estate. Nonetheless in his bankruptcy schedules Defendant did not disclose that the Trust owned the Port Aransas Property or the Boerne Property.

43.     The Boerne Property was a house that was sold by Defendant post-petition on February 8, 2019 without notifying the Chapter 7 trustee of the pending sale. The closing statement from

this sale is attached hereto as <u>Exhibit E.</u> Defendant did not voluntarily disclose this sale. Funds from the sale of the Boerne Property were used to pay off the mortgage indebtedness on the Port Aransas Property (apparently $233,567.40). Exhibit E at line H(06). In addition, $30,000 of funds of the bankruptcy estate from the proceeds of the sale of the Boerne Property were paid by Defendant to a law firm as a retainer, and other net proceeds from the sale of the Boerne Property were used by Defendant although all of this funds belonged to the Debtor's bankruptcy estate. Defendant for many months has resided at the Port Aransas Property rent free and mortgage free (subject to the bankruptcy estate's right of subrogation; since funds of the bankruptcy estate were used to pay off the mortgage on the Port Aransas Property, the Debtor's bankruptcy estate steps into the shoes of the mortgagee who was paid off). This conduct by Defendant at a minimum violated sections 363 and 549 of the Bankruptcy Code, because Defendant wrongfully transferred and/or removed the net proceeds of the sale of the Boerne Property to others instead of these funds being paid to the Debtor's Chapter 7 bankruptcy estate. Even after Defendant's creditors' meeting on March 22, 2019, Defendant on April 18, 2019 filed amended bankruptcy schedules falsely stating he had no rights or powers he could exercise for his benefit in a trust. See Docket No. 32 at 4 (Question #25).

44.    Regarding the allegations in paragraphs 41-43 the Defendant acted with the intent to hinder and delay his creditors, and he wrongfully transferred property of the bankruptcy estate in violation of the Bankruptcy Code.

45.    The conduct of Defendant described above bars Defendant from receiving a bankruptcy discharge of his debts to Plaintiff for the reasons set forth in sections 523(a)(4) and 523(a)(6) of the Bankruptcy Code, and Plaintiff requests that the Court enter its judgment stating the same.

46.     If the Court does not grant Plaintiff sufficient relief under sections 523(a)(4) and/or 523(a)(6) of the Bankruptcy Code, Plaintiff alternatively requests that the Court deny Defendant a discharge of <u>any</u> of his debts, including the indebtedness that he owes to Plaintiff alleged herein, based on §727 (a)(2) of the Bankruptcy Code.

## IV.    <u>Conclusion and Request for Relief</u>

47.     Pursuant to sections 523 and 727 of the Bankruptcy Code, the federal Declaratory Judgment Act (28 U.S.C. §2201-2202),[1] and other applicable law, Plaintiff requests that the Court enter its final judgment that the debts owed by Defendant Kent Linduff to Plaintiff are not dischargeable in his bankruptcy case based on 11 U.S.C. 523 (a)(4) and (a)(6), and that Defendant Kent Linduff therefore remains liable for his debts to Ms. Roberts reflected by the Judgment despite his bankruptcy filing. Alternatively, Plaintiff requests that the Court deny Defendant Kent Linduff a discharge of any of his pre-petition debts based on 11 U.S.C 727 (a)(2). Plaintiff also requests that this Court award her a monetary judgment of this Court in the full amount owed by Defendant Kent Linduff under the Judgment (plus post-judgment interest from the date of the Judgment, and any other appropriate post-judgment charges or costs associated with the same), plus Plaintiffs' attorney's fees and related expenses, and court costs and charges, associated with this adversary proceeding as permitted by applicable law.  Plaintiff

---

[1] 28 U.S.C. 2201 (a) provides:  "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such".

requests that the Court grant her this relief, and all other appropriate relief, whether in law or in equity, to which she is entitled.

Respectfully submitted,

_____/s/ Timothy P. Dowling_____
Timothy P. Dowling
Southern District of Texas I.D. No. 2431
State Bar No. 06083900
Anderson, Lehrman, Barre & Maraist, L.L.P.
Bankruptcy counsel for Plaintiff
1001 Third St., Suite 1
Corpus Christi, Texas 78401
(361) 884-4981 Telephone
(361) 884-1286 Fax
tdowling@albmlaw.com

_/s/Bruce Tough (by Tim Dowling with permission)_
Southern District of Texas No. 513
The Tough Law Firm, PLLC
Counsel for Lisa Roberts
819 Crossbridge Drive
Spring, Texas 77373
Telephone: (281) 681-0808
FAX: (281) 681-0909
Email: btough@toughlawfirm.net

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on May 20, 2019 a true and correct copy of the foregoing pleading was filed online with the Clerk of the Bankruptcy Court and was also served in the manner indicated below on the persons named below:

*First class mail*
Ryan Lott
Counsel for the Debtor
The Lott Firm, PLLC
3422 Rosefinch Trail
Austin, Texas 78746

Simon W. Hendershot, III
Hendershot, Cannon & Hisey, P.C.
1800 Bering Drive, Suite 600
Houston, Texas 77057

Catherine Stone Curtis
Chapter 7 trustee
Pulman, Cappuccio & Pullen, LLP
P.O. Box 720788
McAllen, Texas 78504

Thomas Rice
Counsel for the Chapter 7 trustee
Pulman Cappuccio & Pullen, LLP
2161 NW Military Highway, Ste. 400
San Antonio, TX 78213

_____
/s/ Timothy P. Dowling

## EXHIBITS TO THIS MOTION

Exhibit A:      Company Judgment

Exhibit B:      Individual Judgment

Exhibit C:      Fourth Court of Appeals' Order and opinion dismissing Defendant's
                appeal of the Individual Judgment

Exhibit D:      Information regarding the Port Aransas Property from the
                Nueces County Appraisal District

Exhibit E:      Closing statement from the sale of the Boerne Property

Roberts—Linduff bankruptcy/Pleadings--/Complaint objecting to discharge